Upon review of the competent evidence of record, and finding no good grounds to receive further evidence or rehear the parties or their representatives, the Full Commission, upon reconsideration of the evidence affirms the Opinion and Award of the deputy commissioner, with some modification.
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing as:
 STIPULATIONS
1. At the time of the alleged injury by accident, the parties were subject to and bound by the provisions of the Workers Compensation Act.
2. The employer-employee relationship existed between defendant-employer and plaintiff.
3. The Insurance Company of the State of Pennsylvania was the carrier on the risk.
4. Plaintiff suffered a heart attack on 20 March 1997. Plaintiff missed work from 20 March 1997 to 15 May 1997.
In addition, the parties stipulated into evidence the following:
1. A packet of medical records and reports.
2. Form 22 State of Days Worked and Earnings of Injured Employee dated 21 August 1998.
3. Employer work detail records which were marked at the hearing as Defendants Exhibit 1.
An Order on Final Pre-Trial Conference dated 23 July 1998 was submitted by the parties at the deputy commissioner hearing and is incorporated by reference.
 * * * * * * * * * * *
Based on the competent and credible evidence of record, the Full Commission makes the following:
 FINDINGS OF FACT
1. On 19 March 1997, plaintiff was thirty-eight years old and had been employed by defendant-employer for approximately eight years as a patrol supervisor. Plaintiff was responsible for making sure that the security guards under his supervision were at their assigned posts and for checking his share of the approximately sixty buildings which were assigned to his team. If a member of plaintiffs team was absent during a shift, plaintiff would work extra hours to cover the buildings. In addition, plaintiff responded to alarms, handled customer complaints, and completed paper work.
2. Plaintiff was paid $8.75 per hour for forty hours a week and was paid time and one-half for overtime hours. Plaintiffs average weekly wage at the time in question was $598.07; he was working an average of 58.9 hours per week during the year ending in March 1997. The hours plaintiff worked varied from week to week. For instance, plaintiff had worked 106 hours in one week, but he also worked for a full month without any overtime.
3. Sometime in the winter of 1997, plaintiff convinced defendant-employer to hire his nephew, Jimmy Young, as a security guard. Mr. Young was not getting along with his parents and had moved in with plaintiff and his wife. Plaintiff trained Mr. Young for the security guard position. Mr. Young was supplied with a uniform, a patrol book, which contained the codes for the building alarms and described the keys for each building, a statement log, in which he was to report what he found on inspection, and a set of keys to the various buildings. At the end of his shift, Mr.Young was required to leave the keys to the buildings, the keys to the company truck, and the patrol book in a cabinet in the office. Employees who were terminating their employment were required to turn in their set of keys along with their uniform.
4. In late February or early March 1997, Mr. Young took a day off from work purportedly to visit his mother in South Carolina. However, Mr. Young did not report for work the next day or at anytime before 20 March 1997. Contrary to company policy, Mr. Young did not turn in his patrol book nor his set of keys, and plaintiff was unable to retrieve these items for defendant-employer by the date of the alleged injury by accident. As Mr. Youngs supervisor, plaintiff was responsible for recovering the patrol book and keys because of their significant security value to the businesses concerned.
5. In addition, Mr. Young ceased payments on a car he purchased from Al Drummond. Mr. Drummond, a friend of plaintiffs, sold the car to Mr. Young on plaintiffs recommendation. Consequently, plaintiff felt somewhat responsible for Mr. Youngs actions.
6. On 6 March 1997, plaintiff reported to the emergency room with complaints of chest pain and bronchitis. Plaintiff underwent blood tests, an EKG, and a chest x-ray. Apparently the blood work and EKG were unremarkable, but the chest x-ray revealed evidence of interstitial disease. On 11 March 1997, plaintiff was treated by his family doctor, Charles S. Wehbie, M.D. Dr. Wehbie diagnosed plaintiff with asthmatic bronchitis with a possible element of pneumonitis and gastrointestinal intolerance due to the medication plaintiff was taking. Dr. Wehbie prescribed different medication.
7. Prior to the emergency room visit on 6 March 1997, plaintiff was consistently working a lot of overtime hours.
8. On 20 March 1997, while plaintiff was working in the office of defendant-employer, his wife called and informed him that Mr. Young was coming to their home that afternoon. Plaintiff advised his wife to call Mr. Drummond and tell him that Mr. Young would be at their home later that day. Plaintiffs wife was to page plaintiff when Mr. Young arrived. Plaintiffs wife contacted Mr. Drummond, who drove to their house to wait for Mr.Youngs arrival. Upon Mr. Youngs arrival, Mr. Young and Mr. Drummond began discussing the car payment issue outside in plaintiffs yard. Their discussion had become intense by the time plaintiff arrived. Mr. Young then approached plaintiffs truck. Plaintiff instructed Mr. Young to stop arguing, to give Mr. Drummond the car keys, and to give plaintiff the keys from work. Plaintiff explained to Mr. Young the importance of the keys and that he needed to retrieve them for defendant-employer.
9. Mr. Young indicated that he was not giving anyone anything, and plaintiff became angry. Plaintiff exited the truck to take the keys from Mr. Young, by force if necessary, when he experienced sudden severe chest pain. Plaintiff grabbed his chest and turned pale. Plaintiffs brother, who was sitting on the porch during the argument, thought that Mr. Young had struck plaintiff. Plaintiffs brother ran over and threw Mr. Young over the hood of the truck. Plaintiff could not breathe well enough to tell his brother that Mr. Young had not hit him. Plaintiff was finally able to speak, and his brother immediately put him in the truck to take him to the hospital. Plaintiffs brother stopped at a fire station on the way because plaintiff feared he would not survive the trip to the hospital. An emergency medical technician gave plaintiff nitroglycerin and monitored his condition while the ambulance was en route to the hospital. Tests performed at the hospital confirmed that plaintiff had had an acute myocardial infarction.
10. A cardiologist, Jack W. Noneman, M.D., saw plaintiff at the hospital that day and initiated therapy for the heart attack. Dr. Noneman became plaintiffs treating cardiologist and performed a cardiac catheterization and angioplasty, in which one of plaintiffs two stenosed coronary arteries was opened. Dr. Noneman decided to wait before opening the second artery. Consequently, plaintiff was discharged on 27 March 1997 but was readmitted to the hospital in April for a second cardiac catheterization and angioplasty. Dr. Noneman continued to follow plaintiffs recovery and released plaintiff to return to work with light duty restrictions on 27 April 1997. Plaintiff was released to full duty work with no restrictions on 23 May 1997.
11. After his release by Dr. Noneman, plaintiff returned to work for defendant-employer, but would not work more than forty hours per week. Plaintiff saw Dr. Noneman periodically for follow-up visits. On 7 October 1997, underwent another cardiac catheterization because Dr. Noneman was concerned that one of the coronary arteries had restenosed. However, only scarring was found during the surgical procedure.
12. Plaintiff stopped treatment with Dr. Noneman, apparently due to a change in his insurance coverage, and began treating with William S. Wheeler, M.D. On 23 February 1998, plaintiff went to the emergency room with a four-day history of chest pain which became worse with exercise. Plaintiff underwent a treadmill test which was positive. Dr. Wheeler performed a cardiac catheterization in which he opened one of plaintiffs coronary arteries. When plaintiff returned to Dr. Wheeler on 19 March 1998, he reported continued chest pain which was not relieved by nitroglycerin. However, subsequent testing revealed improvement in plaintiffs condition since he was able to achieve a much higher heart rate than on earlier stress testing. Dr. Wheeler saw plaintiff again in July 1998 and planned to evaluate him in September 1998 to make sure that the stent inserted to keep the artery open did not fail.
13. Plaintiff had many risk factors for coronary artery disease. Plaintiff had a strong family history of heart disease, with a mother and brother suffering fatal heart attacks by the age of forty. Plaintiffs cholesterol was elevated and he apparently was not getting regular exercise. In addition, plaintiff was a heavy smoker and continued to smoke as of the date of the hearing before the deputy commissioner, despite the fact that his doctors repeatedly advised him that smoking was a strong risk factor for coronary heart disease and that he should stop smoking immediately.
14. Prior to his heart attack on 20 March 1997, plaintiff had preexisting coronary artery disease with plaque formation inside the arteries. The emotionally charged confrontation with Mr. Young on 20 March 1997 could have caused the plaque to fracture, causing a blood clot which occluded the artery and thereby causing plaintiffs heart attack. Plaintiffs heart attack also could have occurred at any time and from any event, such as simply smoking a cigarette.
15. On the afternoon of 20 March 1997, plaintiff wanted to retrieve the car keys for Mr. Drummond, but he was equally motivated by his desire to retrieve the patrol book and keys for defendant-employer. Plaintiff went home on company business. The particular scenario involving Mr. Young and the keys was somewhat unusual; however, the level of exertion involved in the confrontation with Mr. Young was not unusual or extraordinary. Plaintiff was simply angry.
16. Plaintiffs myocardial infarction on 20 March 1997 was due to heart disease. The confrontation with Mr. Young was the event that precipitated plaintiffs heart attack, but the confrontation itself did not involve any unusual or extraordinary exertion.
 * * * * * * * * * * *
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. Plaintiffs heart attack on 20 March 1997 was not caused by unusual or extraordinary exertion; therefore, it did not result from an injury by accident arising out and in the course of his employment with defendant-employer. Dillingham v. YearginConstr. Co., 320 N.C. 499, 358 S.E.2d 380 (1987); Lewterv. Abercrombie Enterprises, Inc., 240 N.C. 399,82 S.E.2d 410 (1954).
2. Plaintiff is not entitled to benefits under the Act for his heart attack. G.S. 97-2 et seq.
 * * * * * * * * * * *
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Plaintiffs claim for compensation under the Act is DENIED.
2. Each side shall pay its own costs.
 S/ _________________________ RENÉE C. RIGGSBEE COMMISSIONER
CONCURRING:
S/ ______________________ DIANNE C. SELLERS COMMISSIONER